1  Richard D. McCune (State Bar No. 132124)
   rdm@mccunewright.com
2  Steven A. Haskins (State Bar No. 238865)
   sah@mccunewright.com
3  Valerie L. Savran (State Bar No. 334190)
   vls@mccunewright.com
4  **McCUNE LAW GROUP, APC**
   3281 E. Guasti Road, Suite 100
5  Ontario, California 91761
   Telephone:  (909) 557-1250
6  Facsimile:   (909) 557 1275

7  Emily J. Kirk (IL Bar No. 6275282)*
   ejk@mccunewright.com
8  **McCUNE LAW GROUP, APC**
   231 N. Main Street, Suite 20
9  Edwardsville, IL 62025
   Telephone: (618) 307-6116
10 Facsimile: (618) 307-6161

11 *Pro Hac Vice* application to be submitted

12 Attorneys for Plaintiff the Putative Class

13

14

15

16

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH BACIGALUPI, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO BANK, N.A., WELLS FARGO & CO,, AMERICAN ARBITRATION ASSOCIATION, INC., and DOES 1 through 5, inclusive, <br><br> Defendants. | Case No.   3:24-cv-06778 <br><br> **COMPLAINT FOR:** <br><br> 1. Fraud in the Inducement <br> 2. Violation of the Electronic Fund Transfer Act (Regulation E, 12 C.F.R. §§ 1005, *et seq.*) <br> 3. Violation of the California Unfair Competition Law (Bus. & Prof. Code § 17200, *et seq.*) <br> 4. Breach of Contract <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I     INTRODUCTION ............................................................................................ 1

II    NATURE OF THE ACTION ......................................................................... 4

III   PARTIES ...................................................................................................... 7

IV    JURISDICTION AND VENUE .................................................................... 8

V     BACKGROUND ........................................................................................... 9

    A.    Defendant Wells Fargo ..................................................................... 9

    B.    Defendant American Arbitration Association, Inc. ........................ 12

    C.    Wells Fargo and AAA's Collusive Relationship to Prevent Arbitration ........................ 13

    D.    Plaintiff Joseph Bacigalupi ............................................................ 15

    E.    Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees .... 15

    F.    Specific Regulation E Requirements ............................................. 18

    G.    Regulation E Compliance ............................................................... 19

    H.    CFPB Issues Guidance on "Junk Fees" ......................................... 20

    I.    The Fee Allegations ....................................................................... 21

        1.    Use of Descriptive Language in the Opt-in Disclosure Applicable to Each Method of Opt-in ........................ 22

    J.    Wells Fargo's History of Improper Fee Practices ......................... 25

        1.    Wells Fargo's Unfair Transaction Posting Order ................................. 25

        2.    In or around 2010, Wells Fargo Adopts Noncompliant Regulation E Opt-in Disclosure Agreement ........................ 25

        3.    Wells Fargo's Practices Violate Regulation E .................................... 27

        4.    Opt-in Existing Customers at the Branch ............................................ 28

        5.    Opt-in Through Online Customers .................................................... 28

        6.    Opt-in by Telephone Customers ........................................................ 29

        7.    Wells Fargo Fails to Properly Re-Opt in Customers ........................ 29

**K.** Wells Fargo's Additional Unfair Fee Practices that also Violate its Contract ................ 29

**VI** CLASS ACTION ALLEGATIONS ................................................................. 31

FIRST CAUSE OF ACTION. ............................................................... 37

(Fraud in the Inducement)…….............................................................. 37

SECOND CAUSE OF ACTION ............................................................ 39

(Violation of Regulation E, 12 CFR 1005, *et seq.*)........................................... 39

THIRD CAUSE OF ACTION ................................................................. 42

(Violation of California's Unfair Competition Law, Business and Professions Code

Section 17200, *et seq.*).................................................... 42

FOURTH CAUSE OF ACTION ............................................................ 45

(Breach of Contract)………… ............................................................ 45

**VII** PRAYER FOR RELIEF ........................................................................ 46

DEMAND FOR JURY TRIAL .................................................................. 47

## I    INTRODUCTION

1.    Joseph Bacigalupi ("Plaintiff") brings this lawsuit against Wells Fargo & Company, Wells Fargo Bank, N.A. ("Wells Fargo") and the American Arbitration Association, Inc. ("AAA") (collectively "Defendants"), on behalf of Wells Fargo customers, on the basis that Wells Fargo has violated Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq*. ("Reg E" or "Regulation E"), and Wells Fargo and AAA have materially misrepresented the arbitration process and fraudulently induced customers to give up their right to litigate their claims in court.

2.    Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must provide customers with a complete, clear, and easily understandable disclosure document accurately describing their overdraft services (opt-in disclosure agreement); the disclosure document must be substantially similar to Regulation E Model Form A9 and presented to customers as a stand-alone document not intertwined with other disclosures; and they must obtain verifiable agreement (affirmative consent) of a customer's agreement to opt-in to the financial institution's overdraft program, regardless of the method of opt-in (i.e., in person at a branch, online, or by phone).

3.    Through May 2022, Wells Fargo attempted to comply with Regulation E by providing customers with a Regulation E opt-in disclosure agreement describing the bank's debit card overdraft service ("DCOS"), called "*What You Need to Know About Overdrafts and Overdraft Fees*" (emphasis in original).[1] Unfortunately, the document used ambiguous and misleading language to describe when Wells Fargo charged overdraft fees. Specifically, it suggested that Wells Fargo charged overdraft fees based on the actual, official account balance instead of the artificial "available balance" Wells Fargo uses as an internal accounting measure. Wells Fargo also provided these

---

[1] *See* Wells Fargo Bank's opt-in disclosure agreement titled "*What You Need to Know About Overdrafts and Overdraft Fees.*" attached hereto as **Exhibit A** (emphasis in original).

Class Action Complaint
Case No.

disclosures as part of an eight-page brochure with other marketing agreements and disclosures. As such, it failed to present the opt-in disclosure agreement separate from other disclosures as Regulation E requires. 12 C.F.R. 1005.17, cmt. 17(b)-6.

4.    Because Regulation E prevents banks from charging any overdraft fees on one-time debit card and ATM transactions without first obtaining affirmative consent based on a proper and accurate disclosure of its overdraft practices as presented in a stand-alone opt-in disclosure agreement using proper opt-in procedures, Wells Fargo's assessment of all overdraft fees on one-time debit card and ATM transactions against customers who were opted-in prior to May 2022 has been and continues to be illegal.

5.    In addition to utilizing a nonconforming opt-in disclosure agreement through May of 2022, Wells Fargo continues to violate Regulation E in other ways. Regulation E requires that customers have a reasonable opportunity to affirmatively consent before a financial institution can assess overdraft fees on one-time debit card and ATM transactions, regardless of the method of opt-in. 12 C.F.R. 1005.17(b)(iii). Such consent must be given by a customer's signature on the opt-in disclosure agreement, or some affirmative action by the customer, such as clicking a button. 12 C.F.R. 1005.17, cmt. 17(b)-4. Instead, Wells Fargo instructed employees to verbally summarize the terms of its Regulation E overdraft program and if the customer said yes based on the unscripted, verbal description, the employee would opt-in the customer. This practice violates Regulation E. Moreover, there is evidence that Wells Fargo is charging customers overdraft fees on ATM transactions without opting-in customers to its Regulation E overdraft program, which also violates Regulation E.

6.    The Consumer Financial Protection Bureau ("CFPB") has found Wells Fargo's method of opting-in customers non-conforming in the context of at least one other bank,[2] and multiple courts have found with the same practice at other banks that at the very least it raises triable issues of fact for the jury to decide.

_____

[2] *See* **Ex. B**, Atlantic Union Bank; CFPB Consent Order at 10-12.

Class Action Complaint
Case No.

7.      Wells Fargo's practices cap a long and documented history of troubling overdraft practices, rendering intervention all the more necessary. Included in that history are a trial court's findings that Wells Fargo had engaged in gouging and profiteering in its overdraft practices, and then misled customers about it. The Ninth Circuit Court of Appeal, in affirming a $203 million judgment against Wells Fargo, let stand the finding that Wells Fargo had misrepresented its overdraft practices (the practice at issue in that case was the order of processing the transactions to increase overdraft fees instead of the current use of an artificial balance to increase overdraft fees), and let stand an injunction prohibiting Wells Fargo from further misrepresenting how it processed transactions related to its overdraft services.

8.      Despite Wells Fargo's Regulation E and other fee violations which affect thousands of its customers, customers cannot initiate lawsuits—either individually or for class action relief—supposedly because Wells Fargo inserted into its Account Agreement an arbitration clause purportedly requiring customers to resolve disputes through what was represented as an individual, efficient, cost-effective and bilateral arbitration process. But what consumers instead receive from Wells Fargo with the help of AAA is an onerous, complex, unduly burdensome, and corporation-friendly arbitration process.

9.      According to the Wells Fargo Account Agreement, consumers are told that "an impartial third party will hear the dispute between Wells Fargo and provide a decision,"[3] referring them to the AAA Consumer Rules. Wells Fargo also represents that "[a]rbitration is beneficial because it provides a legally binding decision in a *more streamlined, cost-effective manner* than a typical court case."[4] (emphasis added).

10.      AAA provides similar misrepresentations, stating that "[a]rbitration is usually *faster and cheaper* than going to court."[5] (emphasis added).

---

[3] *See* Ex. **C,**, Wells Fargo Deposit Account Agreement at 35.
[4] *Id.*
[5] *See* **Ex. D.,** Introduction, AAA Consumer Arbitration Rules.

Class Action Complaint
Case No.

11.    In addition, AAA falsely promises that "[p]roviders of goods and services should develop ADR programs which entail *reasonable cost* to Consumers based on the circumstances of the dispute, including, among other things, the *size and nature of the claim*…"[6] (emphasis added). AAA also misleadingly states that "[n]o party should ever be denied the right to a *fundamentally-fair process* due to an inability to obtain information material to a dispute."[7]

12.    The statements Wells Fargo and AAA have made to fraudulently induce consumers to accept arbitration are false. The arbitration process promised is actually riddled with complex and onerous procedures, is unduly one-sided by denying consumers the right to their own information and thus to a fundamentally fair hearing, and is far from a time or cost efficient process.

13.    As a result of Wells Fargo and AAA's material misrepresentations concerning the arbitration process, they fraudulently induced Plaintiff and Wells Fargo customers to rely on their promises and enter into a binding contract. In addition, the arbitration process designed by Wells Fargo with the cooperation of AAA is fundamentally unfair and in direct contradiction to what was promised to them. Accordingly, Plaintiff and Wells Fargo customers are entitled to void the contract with Wells Fargo requiring arbitration, or enjoin its enforcement as fundamentally unfair, and proceed with litigating their Regulation E and other fee claims in court.

## II     NATURE OF THE ACTION

14.    Plaintiff has brought this class and representative action to assert claims in his own right, as the class representative of all other persons similarly situated, as well as members of the public.

15.    First, Wells Fargo's contract promises that all customers will be entitled to a process that is "more streamlined" and "cost-effective" than a typical court case. It also

---

[6] *See* **Ex. E.,** AAA Consumer Due Process Protocol Statement of Principles, Principle 6.
[7] *Id.,* Principle 13.

-4-

states that "if you have a dispute with us, we hope to resolve it as *quickly* and as *easily* as possible."[8]

16.     Wells Fargo's contract incorporates the AAA Consumer Arbitration Rules.[9] However, AAA, through its own rules and other disclosures, makes similar false and misleading representations about the arbitration process.

17.     By way of example, AAA promises that "[a]rbitration is usually *faster and cheaper* than going to court."[10] (emphasis added).

18.     AAA also falsely asserts that "[p]roviders of goods and services should develop ADR programs which entail *reasonable cost* to Consumers based on the circumstances of the dispute, including, among other things, the *size and nature of the claim*…"[11] (emphasis added). Moreover, AAA states that "[n]o party should ever be denied the right to a *fundamentally-fair process* due to an inability to obtain information material to a dispute."[12]

19.     The aforementioned statements by Wells Fargo and AAA are untrue, and were intended to induce Plaintiff and the putative class members to agree to contract with Wells Fargo and arbitrate their claims.

20.     While AAA and Wells Fargo depict a simple, streamlined, and efficient process, that is the opposite of what Plaintiff and the putative class members received after contracting with Wells Fargo.

21.     For instance, Wells Fargo takes the process of preliminary hearings and turns it into an opportunity to produce interminably long scheduling orders,  and force multiple hearings that often last several hours long simply to set the schedule for each case. In short, Wells Fargo uses its vast advantage in revenue and resources to grind its consumers into submission. Wells Fargo's conduct is not only contrary to fair play, it

---

[8] Exhibit C at 35.
[9] *Id.*
[10] *See* Exhibit D**.,** Introduction, AAA Consumer Arbitration Rules.
[11] *See* Exhibit E, Principle 6.
[12] *Id.,* Principle 13.

Class Action Complaint
Case No.

stands in direct contrast to the AAA Consumer Rules, which claim that arbitration is an expeditious and reasonable process.

22. In addition, Wells Fargo refuses to provide each individual claimant with their own account information, including their monthly statements, as required by law under section 1034(c) of the Consumer Financial Protection Act ("CFPA").[13] The CFPB has made clear that section 1034(c) covers consumer requests for information such as "account information that appears on periodic statements…"[14]

23. In spite of this, Wells Fargo engages in extensive briefing on the issue of whether each claimant is entitled to their own information. Such briefing is often thousands of pages long, consisting of declarations and lengthy exhibits.

24. Additionally, AAA has at every possible turn enabled Wells Fargo to engage in tactics to drive up the time and cost of arbitration. AAA has refused to enforce its own rules pertaining to consumer arbitrations, allowing Wells Fargo to abuse the process at the expense of consumers, and rendering the process business friendly and fundamentally unfair.

25. As a result of Wells Fargo and AAA's misrepresentations, Plaintiff and Wells Fargo customers have entered into a contract requiring arbitration, but have no means to actually arbitrate their claims. They also have been subjected to an unfair process as a result of the collusion between AAA and Wells Fargo to make the process advantageous to the business at the consumer's expense. As a result, they should be allowed to proceed with those claims in court.

26. Plaintiff and the putative class members have been harmed by Wells Fargo's conduct. They have been assessed overdraft fees despite Wells Fargo having not obtained consent using a compliant disclosure agreement. They have also been charged other

---

[13] 12 U.S.C. 5534(c)(1).
[14] *See* **Exhibit F.,** CFPB Advisory Opinion, October 11, 2023, *Consumer Information Requests to Large Banks and Credit Unions*.

Class Action Complaint
Case No.

unfair fees, such as APSN and represent fees, which also constitute a breach of contract, as well as a violation of consumer protection laws.

27.     This action seeks to void the contract requiring arbitration, or enjoin its enforcement as unfair, and seeks damages, including actual damages, statutory damages under Regulation E, restitution, and injunctive relief due to, *inter alia*, Wells Fargo's refusal to allow Plaintiff and Class Members to arbitrate their substantive claims with the assistance and cooperation of AAA, practice of obtaining purported "affirmative consent" using a noncompliant opt-in disclosure agreement, practice of assessing Regulation E overdraft fees without first obtaining the proper consent, practice of utilizing noncompliant opt-in methods, and unlawfully assessing and unilaterally collecting unfair overdraft and NSF fees in violation of its contracts and all other applicable law as set forth herein.

## III     PARTIES

28.     Plaintiff Joseph Bacigalupi is a resident of California, and a Wells Fargo accountholder at all relevant times.

29.     Based on information and belief, Defendant Wells Fargo is a bank with its headquarters located in San Francisco, California, and its principal place of business in Sioux Falls, South Dakota. Wells Fargo also has hundreds of branches throughout the By state of California.

30.     Based on information and belief, Defendant American Arbitration Association, Inc. is a domestic not-for-profit corporation, located at 120 Broadway, 21st Floor, New York, NY 10271.

31.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendants. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

32.     Plaintiffs are unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will

Class Action Complaint
Case No.

be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

33.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

34.     At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

35.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

36.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

**IV     JURISDICTION AND VENUE**

37.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201. This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest

Class Action Complaint
Case No.

1  and costs, and (iii) there is minimal diversity because at least one plaintiff and one

2  defendant are citizens of different States.

3      38.    Venue is proper in this District because Wells Fargo transacts business in

4  this District, Plaintiff and similarly situated persons entered contracts with Wells Fargo in

5  this District, and a substantial part of the events giving rise to the current claims occurred

6  in this District.

7      39.    The Court may exercise personal jurisdiction over Defendant Wells Fargo

8  because Wells Fargo has its principal place of business in this District. The Court may

9  also exercise personal jurisdiction over Defendant American Arbitration Association,

10  Inc., because Defendant regularly conducts business in this District, and the claims giving

11  rise to this lawsuit arose out of its actions or omissions in this District.

**V      BACKGROUND**

**A.    Defendant Wells Fargo**

13

14      40.    Wells Fargo is a nationally chartered bank headquartered in San Francisco,

15  California with over 7,000 branches and 13,000 automatic teller machines (ATMs)

16  nationwide. As of September 2020, Wells Fargo reported that it had over 70,000,000

17  customers and 266,000 employees. Wells Fargo also reported that it holds approximately

18  $1.92 trillion in assets on behalf of its customers. In 2023 alone, Wells Fargo collected

19  almost 1.3 billion in consumer overdraft-related service charges on accounts intended

20  primarily for individuals with personal, household or family use.

21      41.    One of the main services Wells Fargo offers is checking accounts. A

22  checking account balance can increase or be credited in a variety of ways, including

23  automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch;

24  and deposits at ATM machines. Debits decreasing the amount in a checking account can

25  be made by using a debit card for purchases of goods and services (point of sale

26  purchases) that can be one-time purchases or recurring automatic purchases; through

27  withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the

28  other ways to debit the account include writing checks; issuing electronic checks;

-9-

scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

42.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Wells Fargo assesses overdraft fees (a fee for paying an overdrawn item) and non-sufficient funds ("NSF") fees (a fee for a declined, unpaid returned item) to accounts when it claims to have determined that an account has been overdrawn.

43.    The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the accountholder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation. The fee Wells Fargo charges here constitutes very expensive credit that harms the poorest customers and creates substantial profit. According to a 2014 CFPB study:[15]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.
- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.
- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

---

[15] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited September 18, 2024).

Class Action Complaint
Case No.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added)[16]

44.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[17]

45.    Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[18]  In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[19]  More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

46.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-

---

[16] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited September 18, 2024).
[17] Moebs Services, Overdraft Revenue Inches Up in 2018 (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited September 18, 2024).
[18] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited September 18, 2024).
[19] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited September 18, 2024).

-11-

income, and non-white accountholders are among those most likely to be assessed overdraft fees. *Id*. at p. 3. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p. 4. And non-whites are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

**B.    Defendant American Arbitration Association, Inc.**

47.    The American Arbitration Association, Inc. ("AAA") is headquartered in New York, and states that it is the "largest global provider of alternative dispute resolution (ADR) services in the world."[20]

48.    They state that they "lessen[] the load of a tremendously overburdened court system" and "support[] access to justice for all."[21] They affirmatively represent that they provide "*fair, rational, faster,* and *less adversarial* means to handle the disputes that inevitably arise."[22] They further explain that their primary mission as a provider of alternative dispute resolution services is to move "cases through mediation and arbitration *fairly* and *cost effectively…*"[23] (emphasis added).

49.    As an ADR provider, AAA sets out certain rules and procedures for the resolution of consumer disputes. Such rules explain the process that consumers can expect when they file their case in arbitration.

50.    Among such promises, AAA explains that "arbitration is usually *faster* and *cheaper* than going to court."[24] The rules also promise that "[p]roviders of goods and services should develop ADR programs which entail *reasonable cost* to Consumers based on the circumstances of the dispute, including, among other things, the *size and nature of the claim*…"[25] (emphasis added). AAA also states that "[n]o party should ever be denied

---

[20] American Arbitration Association, www.adr.org/about-us (last visited September 19, 2024).
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *See* Exhibit D., Introduction, AAA Consumer Arbitration Rules.
[25] *See* Exhibit E., AAA Consumer Due Process Protocol Statement of Principles, Principle 6.

-12-

the right to a *fundamentally-fair process* due to an inability to obtain information material to a dispute."[26] (emphasis added).

51.     Finally, AAA informs consumers that it is a "a *neutral, independent*, and private not-for-profit organization," assuring them that their claims will be resolved in an unbiased forum.[27] (emphasis added).

**C.     Wells Fargo and AAA's Collusive Relationship to Prevent Arbitration**

52.     Wells Fargo's contract requiring arbitration with AAA is no accident. AAA was directly complicit in Wells Fargo's refusal to allow Plaintiff and the putative Class Members from actually arbitrating their claims.

53.     AAA's governing council is dominated by law firms representing banks and other large corporations using arbitration clauses that mandate the use of AAA to resolve disputes.  AAA brags in its 2022 annual report that its "Council and Board of Directors afforded executives a sweeping view of the latest developments and best thinking from the for-profit and non-profit sectors."[28]

54.     In addition, its "Council of 80" includes multiple law firms who represent banks generally and Wells Fargo specifically, and who have influenced AAA rules to benefit large corporations like Wells Fargo at the expense of consumers.[29]

55.     AAA's inherent lack of neutrality is contrary to statements Wells Fargo and AAA both make to induce consumers to arbitrate their claims.

56.     Among the events and actions demonstrating AAA's lack of neutrality and independence are the following:

- One of America's most anti-consumer advocacy organizations is the Chamber of Commerce. In particular, the Chamber stringently opposes consumer class actions

---

[26] *Id.,* Principle 13.
[27] *See* Ex. E.
[28] **Ex. G**, *Advancing the Future of Dispute Resolution,* 2022 Annual Report and Financial Statements at 7.
[29] *Id.*

Class Action Complaint
Case No.

as a procedural mechanism for resolving consumer claims against large companies, including banks.[30]

- Mayer Brown LLP has repeatedly represented the Chamber of Commerce, banks, and other large corporations to advocate that Courts must enforce arbitration clauses to bar class actions.[31]

- After the Chamber of Commerce, Mayer Brown, and other law firms represented on AAA's Council achieved significant success in enforcing corporate arbitration clauses used against consumers, consumers began filing thousands of individual cases that were dubbed "mass arbitrations." Without the class action mechanism to resolve small actions, large-scale arbitrations such as these were the only option consumers could use to pursue their claims.

- Four Mayer Brown, LLP attorneys, led by Andrew J. Pincus, a prominent advocate before the U.S. Supreme Court for businesses and banks seeking to dismiss class actions and enforce arbitration agreements, authorized a publication for the U.S. Chamber of Commerce Institute for Legal Reform, a biased publication noting that arbitration could be manipulated to increase the likelihood of defeating consumer claims.[32]

- A prominent part of the Mayer Brown strategy was to overhaul applicable Arbitration Rules and Fees to prevent successful consumer arbitrations.[33] Moreover, these changes were specifically directed at AAA, which Mayer Brown's client, Wells Fargo, had long since selected as its arbitration administrator.[34] These suggested changes included:

  o Requiring Claimants to submit case proof information before being allowed to file a claim.

  o Requiring Claimants to submit personal identifying information such as account numbers before proceeding with a claim.

  o Using an AAA-appointed "process arbitrator" to resolve certain preliminary matters *en masse* before cases could proceed to an individual arbitrator.

- At the same time that Mayer Brown was drafting its jeremiad against mass arbitration, AAA began mysteriously appointing "process arbitrators" to so-called "mass arbitration" cases. For example, in October 2022, AAA assigned a "Process

---

[30] *See* **Ex. H,** *Mass Arbitration Shakedown,* U.S. Chamber of Commerce Institute for Legal Reform, February 2023.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 56. (p. 56).

[34] *Id.* at 56-57.

Class Action Complaint
Case No.

Arbitrator" to a group of cases filed against Wells Fargo, lacking any basis in the rules for doing so. Then, the Process Arbitrator ordered the following, despite the lack of any rules permitting these conclusions:

- o  Claimants were required to submit case proof information, even though the "proof" was in the Respondent's possession and not Claimants, before being allowed to file a claim.
- o  Claimants were required to submit personal identifying information such as account numbers before proceeding with a claim.
- o  The Process Arbitrator made substantive rulings dismissing hundreds of cases without giving the Claimants an opportunity to obtain records or conduct discovery.

57.     The lack of neutrality in the governing structure and direction and control of AAA is sufficient for finding that the arbitration provision in Wells Fargo's Deposit Agreement is unfair and should not be enforced against Plaintiff and putative Class Members.

**D.     Plaintiff Joseph Bacigalupi**

58.     Plaintiff Joseph Bacigalupi is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations, and was opted into Wells Fargo's overdraft program for his debit card and ATM transactions. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper fees on one-time debit card and ATM transactions. By way of example, on August 9, 2022, Plaintiff was assessed a $35 overdraft fee on an ATM withdrawal. The extent of improper charges on Regulation E governed transactions against Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

**E.     Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

59.     The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not make a decision on overdrafts until after the

-15-

transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

60.     And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker (which, at Wells Fargo, involved additional questions outside the topic of overdraft fees because Wells Fargo incentivized sham account practices by its bankers for years).[35]

61.     To mitigate these incentives and to protect customers, the Federal Reserve Board amended Regulation E in 2009. Regulation E was designed to stop these practices. Customers were to get accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only then was the financial institution allowed to assess overdraft fees on these customers.

---

[35] U.S. Dept. of Justice, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization, Feb. 21, 2020, https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited Jan. 30, 2024); Jack Kelly, Wells Fargo Forced to Pay $3 Billion for the Bank's Fake Account Scandal, Forbes, https://www.forbes.com/sites/jackkelly/2020/02/24/wells-fargo-forced-to-pay-3-billion-for-the-banks-fake-account-scandal/?sh=6251c00542d2 (last visited September 19, 2024).

Class Action Complaint
Case No.

62.     With the creation of the CFPB, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accountholders was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[36]

63.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all while assuming very little risk because only a very small percentage of the overdraft customers failed to repay the overdraft fee.

---

[36] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761 (June 7, 2004).

-17-

1    **F.    Specific Regulation E Requirements**

2        64.    Because of the potential for financial institutions to skirt these requirements,

3    Regulation E details specific prerequisites for enrolling in a financial institution's

4    overdraft program. Prior to customers making a decision to give consent, the financial

5    institution must first provide them with a disclosure (commonly referred to as an "opt-in"

6    disclosure) describing the overdraft program. In addition to providing the disclosure to

7    customers before opt-in, to qualify as a proper opt-in disclosure, that disclosure had to be

8    accurate, and in a "clear and readily understandable way," disclosing the terms of the

9    overdraft services set forth in the Regulation. 12 C.F.R. § 1005.4(a)(1).

10       65.    To avoid burying the necessary disclosure language with other unrelated or

11   unnecessary information and ensure all necessary information was provided, the opt-in

12   disclosure needed to be substantially similar to the one-page Model A-9 Form included in

13   Regulation E. 12 C.F.R. § 1005.17(d).

14       66.    A hidden or buried disclosure is the same as no disclosure at all. So,

15   Regulation E required that the opt-in disclosure be segregated from other disclosures and

16   presented to customers as a stand-alone document. 12 C.F.R. § 1005.17(b)(1)(i). The

17   financial institution was also required to avoid marketing the program and otherwise

18   encouraging customers to join. *See* 12 CFR § 1005.1(b) (stating that "the primary

19   objective of the act…is the protection of individual consumers engaging in electronic

20   fund transfers and remittance transfers"); *see also* 12 CFR § 1005.1(b), cmt. 17(b)-4.

21   Obtaining and verifying affirmative consent was similarly important. The financial

22   institution had to obtain affirmative consent separately from other acknowledgements,

23   either by signature (as provided for in the model form), or through some other recordable

24   means of assent (such as the customer checking an electronic box or recording verbal

25   assent). 12 C.F.R. § 1005.17, cmt 17(b)-6.

26       67.    Once having obtained the consumer's affirmative consent after this process

27   is completed, the financial institution is required to provide the customer with

28

Class Action Complaint
Case No.

confirmation of their consent, including instructions on how later to opt out. 12 C.F.R. § 1005.17(b)(1)(iv).

68.     It was only after complying with each of these requirements that a financial institution could charge these customers overdrafts fees on one-time debit card and ATM fees. But even after that, financial institutions maintained the responsibility to administer their overdraft programs in a non-deceptive and fair manner.

**G.     Regulation E Compliance**

69.     In Regulation E's wake, some financial institutions decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, CitiBank, Capital One, Ally Bank, Discover and smaller banks such as One West Bank, Axos Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

70.     With regard to the banks continuing to charge overdraft fees, the CFPB continues to enforce actions against unfair and deceptive practices. In December 2023, it took action against Atlantic Union Bank for illegally enrolling consumers in its checking account overdraft programs. The CFPB concluded that Atlantic Union had "misled consumers who enrolled in [the bank's] overdraft service by phone and failed to provide proper disclosures."[37] In particular, Atlantic Union had instructed employees to give verbal descriptions of the bank's overdraft coverage in place of reading the exact disclosure statement demanded by Regulation E. Those oral descriptions, however, "did not clearly explain which transactions were covered by the service, and made other misleading statements about the terms and conditions of the service." The CFPB

---

[37] CFPB, CFPB Orders Atlantic Union Bank to Pay $6.2 Million for Illegal Overdraft Fee Harvesting, Dec. 7, 2023, available at CFPB Orders Atlantic Union Bank to Pay $6.2 Million for Illegal Overdraft Fee Harvesting | Consumer Financial Protection Bureau (consumerfinance.gov).

-19-

Class Action Complaint
Case No.

discovered that some employees had "omitted key information about the cost of the service and the fact that consumers could incur a hefty overdraft fee for each transaction covered by the service."

## H.    CFPB Issues Guidance on "Junk Fees"

71.    In addition, the CFPB has recently issued guidance on other unfair and deceptive fees. Examples include Authorize Positive, Settle Negative transactions ("APSN") as well as assessing multiple fees on the same returned item ("representment fees").

72.    APSN transactions occur when a financial institution assesses overdraft fees when the consumer had a sufficient available balance at the time the consumer authorized the transaction, but given the delay between authorization and settlement, the consumer's account balance is insufficient at the time of settlement. The CFPB has declared this practice unfair even when disclosed because "consumers [cannot] reasonably avoid the substantial injury" and the injury to consumers "[is] not outweighed by countervailing benefits to consumers or competition."[38] In addition, this practice also violates Wells Fargo's applicable contract, which only states that an overdraft will be assessed when a consumer lacks available funds.[39] However, at the time the transaction is authorized, if the available balance is positive, no fee should be assessed, even if the transaction later settles on a negative balance.

73.    In addition, the CFPB has declared that representment fees are also unfair. When a consumer writes a check or authorizes an ACH transaction, the merchant presents that item for payment. If a consumer does not have sufficient funds to pay for the transaction, the financial institution may decide to return the transaction item unpaid,

---

[38] CFPB, *Supervisory Highlights Junk Fees Update Special Edition,* October 2023, available at (consumerfinance.gov).
[39] *See* **Exhibit I,** Wells Fargo Deposit Account Agreement, November 2020 at 26 (stating that "if your account has *insufficient funds as reflected by your available balance,* the Bank may assess overdraft and/or non-sufficient funds (NSF) fees") (emphasis added). Accordingly, if the consumer had a positive balance at the time of authorization, no overdraft fee was permitted to be assessed.

causing a non-sufficient funds ("NSF") fee to be incurred. However, some merchants re-present the same item again for payment, often multiple times. Representment on the merchant's part is not improper. However, Wells Fargo's practice of charging fees each time a merchant represents the same item not only breaches its own contract, which states that only one NSF fee will be assessed per item, regardless of how many times the item is presented by the merchant,[40] but is an unfair practice because the consumer has no means by which to prevent the representment of that item.

74.     As such, the CFPB has declared the policy of charging more than one NSF fee or an NSF fee followed by an overdraft fee on the same item unfair because consumers are not "reasonably able to avoid the fee because they [do] not know when merchants would re-present transactions…nor could [they] generally stop payments or revoke authorizations" and that such harm "is not outweighed by countervailing benefits to consumers or competition."[41]

75.     Wells Fargo has charged such unfair fees, including APSN overdraft fees, as well as representment fees when the same item is resubmitted by a merchant, in violation of the Consumer Financial Protection Act ("CFPA"), its applicable contracts and disclosures, and other consumer protection laws governing unfair business practices.

**I.      The Fee Allegations**

76.     Wells Fargo has enrolled customers into Regulation E through opt-in at the branch during account opening; at the branch for an existing customer at a time other than account opening; online; and by telephone. Regardless of the means Wells Fargo used to enroll customers in its Regulation E program, prior to May 2022, its disclosures were flawed and failed to satisfy the requirements of Regulation E. Wells Fargo also violated several other opt-in requirements in the process of purportedly enrolling customers into the program. As a result, Wells Fargo enrolled customers into its

---

[40] *Id.* at 30 (stating that if an item is returned for insufficient funds, Wells Fargo may assess *"a returned item fee"* in the singular).
[41] CFPB Bank of America, N.A. Consent Order, July 11, 2023, available at (consumerfinance.gov).

Class Action Complaint
Case No.

Regulation E program using methods insufficient to justify charging overdraft fees at any time.

### 1. Use of Descriptive Language in the Opt-in Disclosure Applicable to Each Method of Opt-in

77.     Prior to May 2022, Wells Fargo's opt-in disclosure, to the extent customers saw it, inaccurately described its overdraft program's terms. It stated that an overdraft occurs when there is not enough money in the account to cover a transaction, but Wells Fargo pays it anyway. This description has been consistently found either ambiguous or misleading by the numerous courts that have examined this exact language.[42]

78.     Like many other financial institutions, Wells Fargo calculates at least two different account balances for each customer's checking account. The "actual balance," "ledger balance," or "current balance" (herein referenced as "actual balance") are industry terms describing the full amount of money in a customer's account at a particular time. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they issue monthly statements to customers. It is also used when the transaction is actually paid. The "available balance" represents the actual balance, with any amounts on which the bank has placed "holds" subtracted. Funds subject to these holds, especially debit holds, may or may not ever actually be posted to

---

[42] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1239-40 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-64 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854-56 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–7 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 374–75 (D. Conn. 2018) (holding there was a "reasonable basis for a difference of opinion" regarding definition of "insufficient funds"); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-5 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016); *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 23 (D.N.H. 2021).

Class Action Complaint
Case No.

1  the account.[43]  But all funds subject to a hold remain in the customer's account until
2  transferred to satisfy a transaction, which can take several days.

3  79.   Wells Fargo uses the "available balance" to assess overdraft fees because
4  doing so increases its opportunities to charge fees. The available balance is often lower
5  (but never higher) than the actual balance, creating a lower threshold against which
6  transactions can be deemed overdrafts. But no matter what calculation the financial
7  institution uses, the account has ***exactly the same*** funds in it. A "hold" is an internal
8  characterization defining a portion of the money in the account, but a "hold" placement
9  removes ***no*** money from the account.

10  80.   The difference between these balances in the context of overdrafts is
11  material to both the financial institution and accountholders. It is estimated that using the
12  available balance increases the number of transactions assessed as overdrafts
13  approximately 10-20%. In those transactions, sufficient funds exist in the account to pay
14  the transaction and therefore the financial institution does not advance its own funds to
15  cover the shortfall. Instead, the customer's own money pays for the transaction, but the
16  customer is charged an overdraft fee anyway.

17  81.   Financial institutions have been put on notice by regulators, banking
18  associations, their insurance companies and risk management departments, and from
19  observing litigation and settlements that using the available balance to calculate
20  overdrafts without disclosure likely violates the law. For instance, the FDIC stated in
21  2019:

22        Institutions' processing systems utilize an "available balance"
23        method or a "ledger balance" method to assess overdraft fees.
        The FDIC identified issues regarding certain overdraft programs
        that used an available balance method to determine when
24        overdraft fees could be assessed. Specifically, FDIC examiners
25        observed potentially unfair or deceptive practices when
        institutions using an available balance method assessed more
        overdraft fees than were appropriate based on the consumer's

---

[43] Ayse Kelce, As Gas Prices Surge, Stations Now Hold Up to $175 of Your Money When You Swipe, WALL STREET JOURNAL, June 28, 2022, available at https://www.wsj.com/articles/as-gas-prices-surge-stations-now-hold-to-175-of-your-money-when-you-swipe-11656277411 (last visited September 19, 2024).

-23-

Class Action Complaint
Case No.

1

2

actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[44]

3

4

82.     Institutions will process transactions using either the "available balance"

5

method or the "ledger balance" method to assess overdraft fees. The FDIC identified

6

issues regarding certain overdraft programs that used an available balance method to

7

determine when overdraft fees could be assessed. Specifically, FDIC examiners observed

8

potentially unfair or deceptive practices when institutions using an available balance

9

method assessed more overdraft fees than were appropriate based on the consumer's

10

actual spending or when institutions did not adequately describe how the available

11

balance method works in connection with overdrafts.[45]

12

83.     And in its Winter 2015 Supervisory Highlights, the CFPB explained that:

13

14

15

16

17

18

19

20

A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[46]

21

22

23

24

84.     Accordingly, describing an overdraft as "not having enough money in the

account to cover a transaction, but we pay [the transaction] anyway" without defining the

terms "money in the account" or mentioning the "available balance" within the opt-in

25

26

27

28

---

[44]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited September 19, 2024).

[45]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited September 19, 2024).

[46] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited September 19, 2024).

-24-

Class Action Complaint
Case No.

1    disclosure is at best ambiguous, likely deceptive, and either way violates Regulation E's
2    requirement to provide a clear and understandable definition of the overdraft practice.

3    **J.     Wells Fargo's History of Improper Fee Practices**

4            **1.    Wells Fargo's Unfair Transaction Posting Order**

5            85.    Increasing the need for judicial intervention and injunction, following a
6    bench trial before Judge William Alsup, Wells Fargo was found in 2010 to have engaged
7    in profiteering and gouging customers with regard to its overdraft practices at that time.
8    It was also found to have misrepresented the manner and order in which it posted
9    transactions and charged overdraft fees as a result. *Gutierrez v. Wells Fargo Bank, N.A.*,
10   730 F. Supp. 2d 1080, 1083 (N.D. Cal. 2010), aff'd in part, rev'd in part and remanded
11   sub nom. *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012). After the
12   appellate courts upheld the trial court's findings, the trial court entered an order
13   permanently enjoining Wells Fargo from making any false or misleading representations
14   relating to the posting order of debit-card transactions. *Gutierrez v. Wells Fargo Bank,*
15   *N.A.*, 944 F. Supp. 2d 819, 830 (N.D. Cal. 2013), aff'd in part, vacated in part, remanded
16   sub nom. *Gutierrez v. Wells Fargo Bank, N.A.*, 589 F. App'x 824 (9th Cir. 2014).

17           **2.    In or around 2010, Wells Fargo Adopts Noncompliant Regulation E**
18               **Opt-in Disclosure Agreement**

19           86.    Beginning in or around 2010, Wells Fargo started opting customers into its
20   overdraft practices using an opt-in disclosure agreement titled, *"What You Need to Know*
21   *About Overdrafts and Overdraft Fees."* (Ex. A.)  A reasonable consumer reading a
22   disclosure agreement requiring a signature or acknowledgement, and which relates to
23   overdrafts and overdraft fees and represents that it contains information the customer
24   needs to know about overdrafts and overdraft fees, would rely on the opt-in disclosure
25   agreement without supplementing that knowledge with reference to other marketing
26   materials and or account agreement language relating to overdrafts.

27           87.    The opt-in disclosure agreement explained that an overdraft "occurs when
28   you do not have enough money in your account to cover a transaction but we pay it

-25-

anyway." It made no reference to "available" balance, "available" funds or any description of how Wells Fargo's internal hold policies affect the balance. Instead, it explained that an overdraft occurred when there was not enough "money in [the] account" and Wells Fargo pays it from their own funds.

88.     This definition misleads consumers into believing that Wells Fargo uses the actual balance to calculate overdrafts. By using ambiguous language, Wells Fargo failed to provide a clear and easily understandable description of its overdraft services in its opt-in disclosure agreement.

89.     Many financial institutions that use the available balance to calculate overdrafts have specifically addressed the practice in their opt-in disclosure agreements. San Diego County Credit Union, for example, defines an "overdraft" as when "the available balance in your account is nonsufficient to cover a transaction at the time that the transaction posts to your account, but we pay it anyway." Synovus Bank defines an overdraft similarly to Wells Fargo, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

90.     In addition, many financial institutions that use the actual balance to determine whether an account is in overdraft (meaning it looks strictly at the amount of funds in an account), as does, *e.g.*, MidFlorida Credit Union, use the same language as Wells Fargo, to reference the actual balance, not the available balance. *See*

-26-

https://www.midflorida.com/terms-and-conditions/overdraft-agreement/ (last visited Feb. 6, 2024) (explaining that the language "[a]n overdraft occurs when you do not have enough money in your account to cover a transactions, but MIDFLORIDA pays it anyway" refers to the "[a]ctual balance." Thus, if there is sufficient money in the account to cover a transaction—even if the money is subject to a hold for pending transactions—then the financial institution will not charge an overdraft fee.

91.    Here, Wells Fargo's failure to accurately, clearly, and in an easily understandable way identify the balance Wells Fargo uses to assess overdraft fees in the stand-alone opt-in disclosure agreement resulted in its failure to obtain the appropriate affirmative consent necessary to opt customers into its overdraft program.

### 3.  Wells Fargo's Practices Violate Regulation E

92.    Prior to May 2022, Wells Fargo used an opt-in disclosure that did not conform to Regulation E's requirements. Instead of a one-page document that was substantially similar to Model Form A-9, Wells Fargo used an 8-page marketing overdraft brochure as its purported "opt-in" disclosure. One page contained disclosures, but they were not segregated from other information, which was illegally targeted at convincing consumers to give consent in any event (assuming the customer even saw the disclosure agreement and/or accompanying marketing statements).

93.    Nor was the eight-page brochure provided to customers as a standalone document. Instead, it was placed in a new account folder containing piles of legal boilerplate, including the account agreement, privacy notice, fee schedule and other documents. These documents were not provided to a new customer until after a Wells Fargo employee verbally described the overdraft program (a practice recently condemned by the CFPB) and asked customers if they wanted to enroll.[47]

94.    Account representatives were allowed to sell DCOS without a script, and the same representatives encouraged consumers to enroll without obtaining signatures or

---

[47] See FN 2, *supra.*

Class Action Complaint
Case No.

other recorded affirmation by the consumer. As such, Wells Fargo failed to provide consumers with a reasonable opportunity to affirmatively consent prior to charging overdraft fees on one-time debit card and ATM transactions.

95.     Finally, upon information and belief, Wells Fargo failed to provide written confirmation that consumers had been opted into DCOS, and that they could revoke their consent at any time, as required by Regulation E.

96.     These practices violated Regulation E because Wells Fargo failed to provide accurate, clear, and understandable language when describing the overdraft program in its disclosure language.

97.     It further violated Regulation E by failing to provide the disclosure in a segregated, stand-alone document. Wells Fargo also violated Regulation E when it waited to provide the necessary disclosures until after enrolling customers into the overdraft program based on a verbal pitch by employees. Finally, Wells Fargo violated Regulation E by enrolling consumers into DCOS without obtaining a separate signature or using another independently objective way of obtaining affirmative consent, and failing to provide written confirmation of enrollment and right to revoke consent.

## 4.  Opt-in Existing Customers at the Branch

98.     Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts.

99.     This procedure violated Regulation E because Wells Fargo failed to use accurate, clear, and understandable language to describe DCOS. Wells Fargo further violated Regulation E by enrolling these customers without obtaining a separate written agreement or another objective verification of affirmative consent.

## 5.  Opt-in Through Online Customers

100.    Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts. (Ex. A.)

101.    The opt-in for online customers also violated Regulation E because Wells Fargo failed to use accurate, clear and understandable language to describe DCOS.

Class Action Complaint
Case No.

### 6. Opt-in by Telephone Customers

102.   Wells Fargo opted-in telephone customers without providing those customers with either the written or verbal disclosure Regulation E required.

103.   The opt-in for telephone customers violated Regulation E for failure to use a disclosure to opt-in customers as Regulation E requires.

### 7. Wells Fargo Fails to Properly Re-Opt in Customers

104.   On May 9, 2022, Wells Fargo changed its opt-in practice to conform with Regulation E (although these compliant practices apply only to new customers after May 18, 2022). Wells Fargo now uses a one-page segregated disclosure form that specifically discloses its use of the available balance to assess overdraft fees. In addition, Wells Fargo began to require signatures before opt-in. However, it has not applied the new procedure to customers enrolled prior to the change. Moreover, upon information and belief, Wells Fargo continues to charge certain customers overdraft fees on ATM transactions without any enrollment into DCOS. As a result, Wells Fargo has done nothing to rectify the fact that it failed to enroll customers into DCOS by following Regulation E's express requirements.

### K. Wells Fargo's Additional Unfair Fee Practices that also Violate its Contract

105.   Wells Fargo also engages in additional conduct constituting unfair and deceptive business practice, but is not covered by the plain language of Regulation E. First, Wells Fargo improperly charges multiple fees for the same electronic transaction or item. When a consumer triggers a payment and Wells Fargo determines that there is not enough money in the account to cover the transaction, Wells Fargo charges a $35 NSF (or Non-Sufficient Funds Fee) and does not pay the transaction. If the payee again presents the same item for processing and there still is not enough money in the account to cover the payment, Wells Fargo then charges an additional $35 fee. It will then do this as many times as the item is re-presented, even though the consumer has only triggered a single transaction.

Class Action Complaint
Case No.

106.    Similarly, Wells Fargo engages in unfair and deceptive business practices by charging overdraft fees on so-called "APSN transactions." These transactions occur when an individual engages in a transaction and a temporary authorization hold is placed on the account for the amount of the transaction. When the hold is placed on the account, there are positive funds available in the account balance to cover the transaction, though subsequent transactions may put the account into a negative balance.

107.    In such cases, Wells Fargo is assured that customers will have sufficient funds to cover the transaction, because the funds have been held and sequestered for payment. Nevertheless, Wells Fargo will later assess overdraft fees on these same transactions if and when they settle sometime later into a negative balance.

108.    Such practices also violate Wells Fargo's contract. Specifically, Wells Fargo's contract states that "if an item is returned for insufficient funds, [Wells Fargo] may assess *a returned item fee*" in the singular.[48] The only reasonable construction of such language is that even if the same item is resubmitted multiple times, one item is only subject to one fee. As such, while the first NSF fee is not at issue, the second (or sometimes third) NSF fee assessed on the same item constitutes a breach of contract.

109.    Further, Wells Fargo's APSN practice is also a violation of its contract. When a debit card transaction is authorized, intervening transactions may come out before the transaction "settles." However, Wells Fargo's contract states that an overdraft occurs when an account has an insufficient available balance.[49] The only reasonable construction is that if the account contains sufficient available funds at the time of authorization, an overdraft will not be assessed. Making overdraft determinations at a different time than when the transaction was authorized, such as when the bank actually pays the transaction, which could occur several days later, was not authorized by contract, and not within a consumer's reasonable expectations.

---

[48] Ex. I at 30.
[49] *Id.* at 27 (stating that "if the available balance in your account is not enough to pay all of your transactions, we will take the following steps….and decide whether to pay your transaction into overdraft or return it unpaid").

-30-

110.   Accordingly, Wells Fargo's APSN and representment fee practices violate its contracts.

## VI    CLASS ACTION ALLEGATIONS

111.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

112.   Plaintiff brings this case, and each of the respective causes of action, as a class action.

113.   The "Class" is composed of one of the following:

The Fraud in the Inducement Class:

> All customers of Wells Fargo who were bound by an arbitration agreement in their consumer contract beginning three years preceding the filing of the first individual arbitration demand and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

The Regulation E Class:

> All customers of Wells Fargo who have or have had accounts with Wells Fargo who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of the first individual arbitration demand and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

The UCL, Section 17200 Class:

> All customers of Wells Fargo who have or have had accounts with Wells Fargo who were assessed an overdraft fee on a one-time debit card or ATM transaction, or were assessed an overdraft fee on a transaction that was authorized on a positive balance and later settled on a negative balance, or who were assessed more than one NSF fee, or an NSF fee followed by an overdraft fee, on the same transaction item, beginning four-years preceding the filing of the first individual arbitration demand and ending on the date the Class is certified, Following discovery, this definition will be amended as appropriate.

The Breach of Contract Class:

> All customers of Wells Fargo who have or had accounts with Wells Fargo who were assessed an overdraft fee on a transaction that was authorized on a positive balance and later settled on a negative balance, or who were assessed more than one NSF fee, or an NSF fee followed by an overdraft fee, on the same transaction item, beginning four-years preceding the filing of the first individual arbitration demand and ending on the date

Class Action Complaint
Case No.

1
2

the Class is certified, Following discovery, this definition will
be amended as appropriate.

3    114.   Excluded from the Classes are: 1) any entity in which Defendants have a
4    controlling interest; 2) officers or directors of Defendants; 3) this Court and any of its
5    employees assigned to work on the case; and 4) all employees of the law firms
6    representing Plaintiff and the Class Members.

7    115.   This action has been brought and may be properly maintained on behalf of
8    each member of the Class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

9    116.   **Numerosity** – The members of the Class ("Class Members") are so
10   numerous that joinder of all Class Members would be impracticable. While the exact
11   number of Class Members is presently unknown to Plaintiff, and can only be determined
12   through appropriate discovery, Plaintiff believes based on the percentage of customers
13   that are harmed by these practices with banks and credit unions with similar practices,
14   and the number of customers who bank with Wells Fargo and are required to arbitrate
15   their claims with AAA, that the Class is likely to include thousands of customers.

16   117.   Upon information and belief, Defendant Wells Fargo has databases, and/or
17   other documentation, of its customers' transactions and account enrollment. These
18   databases and/or documents can be analyzed by an expert to ascertain which of
19   Defendant's customers has been harmed by its practices and thus qualify as a Class
20   Member. Further, the Class definitions identify groups of unnamed plaintiffs by
21   describing a set of common characteristics sufficient to allow a member of that group to
22   identify himself or herself as having a right to recover. Other than by direct notice
23   through mail or email, alternative proper and sufficient notice of this action may be
24   provided to the Class Members through notice published in newspapers or other
25   publications.

26   118.   **Commonality** – This action involves common questions of law and fact.
27   The questions of law and fact common to both Plaintiff and the Class Members include,
28   but are not limited to, the following:

-32-

- Whether Wells Fargo used the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions;
- Whether the opt-in disclosure agreement Wells Fargo used to opt-in Class Members violated the mandate of Regulation E that the opt-in disclosure agreement must accurately, clearly, and in an easily understandable way describe the overdraft services of Wells Fargo;
- Whether Wells Fargo violated Regulation E by failing to provide an opt-in disclosure agreement that was "substantially similar" to the Model A-9 form, and did not include information not authorized by the regulation;
- Whether Wells Fargo violated Regulation E by not obtaining Class Members' affirmative consent to enroll in its overdraft services separately from all other acknowledgements;
- Whether Wells Fargo violated Regulation E by failing to provide Class Members with a reasonable opportunity to affirmatively consent prior to being charged overdraft fees on one-time debit card and ATM transactions by allowing Class Members to opt into DCOS based on a verbal pitch by Wells Fargo's employees;
- Whether Wells Fargo violated Regulation E by failing to provide Class Members with written confirmation of their consent to opt-in, as well as right to revoke that consent;
- Whether Wells Fargo violated Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members;
- Whether Wells Fargo's conduct in violating Regulation E also violated the Section 17200;
- Whether Wells Fargo's practices of assessing APSN overdraft fees

-33-

and representment fees violate Section 17200;

- • Whether Wells Fargo's collusion with AAA to enforce arbitration violates Section 17200;

- • Whether Wells Fargo's practices of assessing APSN and representment fees violate its applicable contracts and disclosures;

- • Whether Wells Fargo continues to violate Regulation E and Section 17200 by not opting in (or not re-opting in) customers and the public using an opt-in disclosure agreement and/or opt-in practices that do not violate Regulation E but continuing to them overdraft fees on one-time debit card and ATM transactions based on an opt-in disclosure agreement and practices that violate Regulation E;

- • Whether Defendants' conduct as alleged herein constitutes fraud in the inducement;

- • Whether Defendants' fraudulent conduct as alleged herein entitles Plaintiff and Class Members to void their contracts;

- • Whether Plaintiff and Class Members are entitled to monetary damages;

- • Whether Plaintiff and Class Members are entitled to injunctive relief under Section 17200;

- • Whether Plaintiff and Class Members are entitled to statutory damages under Regulation E; and

- • Whether Plaintiff and Class Members are entitled to an award of attorneys' fees and costs under Regulation E.

119. **Typicality** – Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding Defendants' alleged wrongful conduct committed against Plaintiffs and all of the Class Members are substantially the same because the opt-in disclosure agreement was the same, the opt-in procedures were the same, the fee assessment processes were the same, and Defendants' contracts and other

Class Action Complaint
Case No.

disclosures pertaining to arbitration used uniform language. Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class Members and the general public.

120. **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

121. **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendants' wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other

Class Action Complaint
Case No.

available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendants' violations of law to proceed without remedy and allowing Defendants to retain the proceeds of its ill-gotten gains.

122.   Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

123.   Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendants' own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

124.   This matter is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or
- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Class Action Complaint
Case No.

1 Common questions of law and fact exist as to the members of the Class and predominate
2 over any questions affecting only individual members, and a class action is superior to
3 other available methods of the fair and efficient adjudication of the controversy,
4 including consideration of:

5 • the interests of the members of the Class in individually controlling
6 the prosecution or defense of separate actions;

7 • the extent and nature of any litigation concerning the controversy
8 already commenced by or against members of the Class;

9 • the desirability or undesirability of concentrating the litigation of the
10 claims in the particular forum; and the difficulties likely to be
11 encountered in the management of a class action.

12 125. Defendants have acted or refused to act on grounds generally applicable to
13 the class, thereby making appropriate final declaratory and injunctive relief with respect
14 to the class as a whole under Federal Rule of Civil Procedure 23(b)(2). The Court should
15 order that Defendant Wells Fargo's contract requiring arbitration in accordance with the
16 AAA Consumer Rules is void, allowing Plaintiff and Class Members to litigate their
17 claims. The Court should also order that Wells Fargo must cease charging overdraft fees
18 to its customers who were purportedly opted into DCOS using a non-compliant
19 disclosure agreement, unless and until Wells Fargo opts-in customers using a compliant
20 disclosure agreement. Finally, the Court should order Wells Fargo is to cease assessing
21 its customers overdraft fees on ATM transactions if they have not been properly opted-in
22 and should cease charging customers fees on APSN and representment transactions.
23 ///

24 ### CAUSES OF ACTION
25 ### FIRST CAUSE OF ACTION
26 ### (Fraud in the Inducement)

27 126. The preceding allegations are incorporated by reference and re-alleged as if
28 fully set forth herein.

-37-

Class Action Complaint
Case No.

127.   As alleged more fully herein, Defendants Wells Fargo and AAA disseminated false and misleading information pertaining to the arbitration process with AAA.

128.   Defendants promoted the arbitration process with full knowledge that it would actually be extremely time-consuming, expensive, and inefficient process for any consumer bringing a claim, and with full knowledge that consumers would rely on such statements pertaining to arbitration in agreeing to arbitrate their claims.

129.   Specifically, Wells Fargo's contract promises that all customers will be entitled to a process that is "more streamlined" and "cost-effective" than a typical court case. It also states that "if you have a dispute with us, we hope to resolve it as *quickly* and as *easily* as possible."

130.   In addition, AAA misleadingly informs consumers that they provide a "*fair, rational, faster,* and *less adversarial* means to handle the disputes that inevitably arise." They further explain that their primary mission as a provider of alternative dispute resolution services is to move "cases through mediation and arbitration *fairly* and *cost effectively…*"

131.   Moreover, in its applicable rules, AAA explains that "arbitration is usually *faster* and *cheaper* than going to court." The rules also promise that "[p]roviders of goods and services should develop ADR programs which entail *reasonable cost* to Consumers based on the circumstances of the dispute, including, among other things, the *size and nature of the claim*…" AAA also states that "[n]o party should ever be denied the right to a *fundamentally-fair process* due to an inability to obtain information material to a dispute." (emphasis added).

132.   Finally, AAA informs consumers that it is a "a *neutral, independent*, and private not-for-profit organization," assuring them that their claims will be resolved in an unbiased forum. (emphasis added).

133.   However, Wells Fargo and AAA have designed the arbitration process to be difficult, time-consuming, and expensive. Through, *inter alia,* extensive motion practice

-38-

on common issues in each individual case, lengthy preliminary hearings with required briefing that often amounts to thousands of pages of documents, deposing Wells Fargo's Federal Rule 30(b)(6) witness in each individual case on common issues, and in person hearings and depositions in each case all over the country, Wells Fargo and AAA have created a process so arduous, cumbersome, and expensive, that consumers effectively have no means to actually arbitrate their claims.

134.   By promoting arbitration as fast, efficient, and cost-effective, Wells Fargo and AAA have fraudulently induced Plaintiff and Class Members to enter into a binding agreement with Wells Fargo to arbitrate their claims.

135.   The misrepresentations concerning arbitration are material, as they relate to consumers' ability to adjudicate their claims.

136.   The misrepresentations are likely to mislead a reasonable consumer who is acting reasonably under the circumstances.

137.   Defendants knew of the falsity of their representations regarding arbitration at the time they were made, and intended that such misrepresentations would induce consumers to rely on them and agree to arbitrate their claims and give up the right to litigate their claims in court, which they did to their detriment.

138.   Accordingly, Plaintiff and the Class have suffered harm as a proximate result of Defendants' violations of law and wrongful conduct.

139.   As a result, Plaintiff seeks an order voiding the contract requiring arbitration because Defendants fraudulently induced Plaintiff and the Class Members to enter into such a contract by misrepresenting the true nature of arbitration, which they relied on to their detriment.

## SECOND CAUSE OF ACTION
### (Violation of Regulation E, 12 CFR 1005, *et seq.*)

140.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

Class Action Complaint
Case No.

141.   By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant Wells Fargo violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

142.   Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E.  12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

143.   The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E.  *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase*

-40-

1  *Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff

2  Commentary for the Truth In Lending Act's Reg Z).

3      144.   Defendant Wells Fargo failed to comply with Regulation E, 12 C.F.R. §

4  1005.17, which requires affirmative consent before a financial institution may assess

5  overdraft fees against customers' accounts through an overdraft program for ATM

6  withdrawals and non-recurring debit card transactions. Defendant Wells Fargo has failed

7  to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide

8  its customers in a "clear and readily understandable way" a valid description of the

9  overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant has

10  selected an opt-in method that fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it

11  states in the non-conforming disclosure agreement that an overdraft occurs when there is

12  not enough money in the account to cover a transaction but Defendant pays it anyway.

13  But, in fact, Defendant assesses overdraft fees even when there is enough money in the

14  account to pay for the transaction and Defendant needs to advance no funds at all. This is

15  accomplished by using the internal bookkeeping available balance to assess overdraft

16  fees, rather than the actual and official balance of the account. Defendant failed to use

17  language to describe the overdraft service that identified that it was using the available

18  balance to assess overdraft fees, which meant that in a significant percentage of the

19  transactions that were the subject of the overdraft fee, there was money in the account to

20  cover the transaction and Defendant did not have to advance any money – yet Defendant

21  assessed an overdraft fee anyway.

22      145.   Defendant also failed to provide its opt-in disclosure agreement as a stand-

23  alone form that was "substantially similar" to the Model A-9 form, by including it in a

24  brochure along with other documents and disclosures. Further, based on information and

25  belief, Defendant did not show the form to customers prior to opting them in, instead

26  relying on employees' unscripted verbal description of the program to then enroll

27  customers. Wells Fargo also appears to be charging overdraft fees on ATM transactions

28  for customers who are not opted-in to the program. Defendant thus failed to obtain Class

-41-

Members' affirmative consent prior to charging them overdraft fees on one-time debit card and ATM transactions. Finally, Defendant failed to provide Class Members with written confirmation of their consent to opt-in, as well as the right to revoke such consent.

146.   As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions absent a compliant disclosure agreement and compliant opt-in procedures, Defendant Wells Fargo was not and is not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class by assessing overdraft fees on one-time debit card and ATM transactions.

147.   As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to actual damages, statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## THIRD CAUSE OF ACTION

### (Violation of California's Unfair Competition Law, Business and Professions Code Section 17200, *et seq.*)

148.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

149.   Defendant Wells Fargo and AAA's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

-42-

150.    The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting on behalf of the general public. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair competition in violation of the statutory scheme, or restitution to victims of the unfair competition.

151.    As further alleged herein, Defendant Wells Fargo's conduct violates the UCL's "unlawful" prong because that conduct violates public policy and/or the text of Regulation E. Defendant's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiff and Class Members arising from Defendant's unlawful practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

152.    Defendant's unlawful business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members, and the general public. Defendant's conduct was substantially injurious to Plaintiff and the Class Members as they have been forced to pay millions of dollars in improper fees, collectively.

153.    Moreover, as described herein, Defendant Wells Fargo's conduct also violates the UCL's "unfairness" prong by assessing fees in violation of Regulation E, and charging fees on APSN and representment transactions.

154.    Additionally, Defendant Wells Fargo and AAA's arbitration clause  and arbitration process violate the UCL's "unfairness" prong by mandating an arbitration process that is not fair, cost-effective, streamlined, or neutral. Defendant Wells Fargo colluded with AAA to create an arbitration process that disadvantages consumers. While AAA and Wells Fargo benefit, consumers are unable to actually arbitrate their claims.

Class Action Complaint
Case No.

Accordingly, Wells Fargo and AAA should be enjoined from applying the arbitration contract and the AAA rules to Plaintiff and Class Members' claims, and the arbitration provision and rules should be further enjoined as fundamentally unfair.

155. As a direct and proximate result of Defendant Wells Fargo and AAA's violations of the UCL, Plaintiff and Class Members have been assessed improper and illegal overdraft and NSF fees, and have been forced to expend time and money in a process that was designed to prevent arbitration of their claims. As a result, Defendant Wells Fargo and AAA have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of Section 17200 described in this Complaint.

156. Further, absent injunctive relief forcing Defendant Wells Fargo and AAA to disgorge itself of its ill-gotten gains and injunctive relief prohibiting Defendants from enforcing the arbitration provision, as well as continuing to charge unlawful and unfair overdraft and NSF fees, Plaintiff and the Class Members will continue to be harmed.

157. Defendant Wells Fargo must also be required to immediately stop charging illegal overdraft fees unless and until it re-opts-in current customers using a Regulation E complaint opt-in disclosure agreement and process, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to Defendant's conduct violative of the UCL.

158. Plaintiff requests that he be awarded all other relief as may be available by law, pursuant to California Business & Professions Code § 17203, including an order of this court enjoining enforcement of Defendants' arbitration provision and arbitration rules, compelling Defendant Wells Fargo to cease all future unlawful and unfair business practices related to its overdraft and NSF practices, including its practice of charging overdraft fees on Regulation E transactions absent a compliant opt-in disclosure agreement and opt-in procedures, as well as charging APSN and representment fees.

-44-

Class Action Complaint
Case No.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)

159.  Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

160.  Plaintiff is able to plead fraud in the inducement and a contract damage claim in the alternative.

161.  Plaintiff and Class Members entered into Deposit Account Agreements constituting the relevant contracts with Defendant Wells Fargo covering the terms and conditions of their consumer accounts. This contract was drafted by and binds Defendant.

162.  By the contract's own terms, if an item was returned based on insufficient funds, only one NSF fee would be assessed, regardless of the number of times the same item was resubmitted by the merchant. Specifically, the contract states that, "if an item is returned for insufficient funds, [Wells Fargo] may assess *a returned item fee*." (emphasis added).

163.  Despite contractual language clearly indicating that for each item only one singular NSF fee may be assessed, Defendant Wells Fargo routinely charged multiple NSF fees for the same transaction item in violation of its contract and disclosures.

164.  In addition, Defendant Wells Fargo's contract also discloses that overdrafts would be assessed only when a consumer's account lacked sufficient available funds. Specifically, it states that, "if the available balance in your account is not enough to pay all of your transactions, we will take the following steps….and decide whether to pay your transaction into overdraft or return it unpaid." It also states that, "if your account has *insufficient funds as reflected by your available balance,* the Bank may assess overdraft and/or non-sufficient funds (NSF) fees") (emphasis added).

165.  However, Defendant Wells Fargo assessed overdraft fees to Plaintiff and Class Members when their accounts had available funds by charging APSN fees. Specifically, the transactions at issue were authorized on a positive available balance, but later settled on a negative available balance. However, by charging overdraft fees on

-45-

transactions that were authorized when Plaintiff and Class Members had sufficient available funds, regardless of whether those transactions settled negative days later, Defendant violated its contract.

166.   As a direct and proximate cause of Defendant Wells Fargo's breach of contract, Plaintiff and Class Members have incurred wrongful NSF and overdraft fees.

167.   Plaintiff and all Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of Defendant's contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

168.   As a direct and proximate result of Defendant Wells Fargo's material breaches, Plaintiff and Class Members have been damaged by assessment of wrongful fees in an amount to be proven at trial, and seek relief as set forth in the Prayer below.

## VII   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

    a.    for an order voiding and rescinding Defendant's contract requiring arbitration due to fraud in the inducement, or in the alternative enjoining the enforcement of the arbitration provision and AAA arbitration rules under the UCL statute;

    b.    for an order certifying this action as a class action;

    c.    for an order enjoining the unlawful conduct alleged herein;

    d.    for actual damages;

    e.    for statutory damages under Regulation E;

    f.    for restitution;

    g.    for injunctive relief;

    h.    for pre-judgment and post-judgment interest as provided by law;

    i.    for costs;

    j.    for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

Class Action Complaint
Case No.

k.      for such other relief as the Court deems just and proper.

Dated: September 26, 2024                    Respectfully Submitted,

*/s/Richard D. McCune*
Richard D. McCune
rdm@mccunewright.com
Steven A. Haskins
sah@mccunewright.com
Valerie L. Savran
vls@mccunewright.com
**McCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk *
ejk@mccunewright.com
**McCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiff and the Putative Class

*Pro Hac Vice* application to be submitted

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: September 26, 2024                    Respectfully Submitted,

*/s/Richard D. McCune*
Richard D. McCune
rdm@mccunewright.com
Steven A. Haskins
sah@mccunewright.com
Valerie L. Savran
vls@mccunewright.com
**McCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250

-47-

Facsimile:   (909) 557 1275

Emily J. Kirk*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:   (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiff and the Putative Class

*Pro Hac Vice* application to be submitted

-48-

Class Action Complaint
Case No.